**PALM SPRINGS MEDICAL CLINIC, INC., dba Palm Springs Medical Center, Plaintiff,**

v.

**DESERT HOSPITAL et al., Defendants.**

**No. CV 85–6163 PAR.**

United States District Court, C.D. California.

Jan. 9, 1986.

John Izard, Michael Eric Ross, Jane E. Jordan of King & Spalding, Atlanta, Ga., John A. Kronstadt, Regina A. Stagg of Blanc Gilburne Williams & Johnston, Los Angeles, Cal., for plaintiff Palm Springs Medical Clinic, Inc. dba Palm Springs Medical Center.

Carlo Coppo, Carol Isackson of Carlo Coppo & Assoc., Del Mar, Cal., for defendants Desert Hosp. and Peter Tynberg, M.D.

Randolph M. Even, Hill, Genson, Even, Crandall & Wade, Los Angeles, Cal., for defendant Charles J. Supple, M.D.

## MEMORANDUM OF DECISION AND ORDER

RYMER, District Judge.

This is an action by Palm Springs Medical Clinic, Inc., doing business as Palm Springs Medical Center ("PSMC"), against Desert Hospital ("Desert"); Peter Tynberg, M.D.; and Charles J. Supple, M.D. PSMC is a private corporation providing medical services in the Palm Springs, California area (Complaint ¶ 4). Tynberg is Chief of Staff and Chairman of the Medical Executive Committee at Desert and a member of Eisenhower Medical Center ("EMC"), another general hospital in the Palm Springs area that directly competes with PSMC (id. ¶ 5). Supple is a member of the medical staff at Desert and a principal beneficiary of the Sunrise Associates Trust, the owner-lessor of the land upon which PSMC's main office is located (id. ¶ 6).

PSMC alleges that Desert, Tynberg, and Supple conspired to injure PSMC and eliminate it as a competitive provider of medical services in the Palm Springs area (id. ¶ 14). Specifically, PSMC alleges that the defendants hindered the initial credentialing of PSMC physicians at Desert and EMC; hindered the granting of staff privileges to PSMC physicians at Desert and EMC; interfered with PSMC's efforts to recruit new physicians; arranged for Desert to purchase the land and buildings of PSMC's main office on "sweetheart terms" in order to injure PSMC and enable Desert to establish its own facilities; induced suppliers of PSMC to reduce the availability of equipment or credit in the purchase of equipment; spread false rumors designed to lower consumer confidence in PSMC; and disparaged the services PSMC provided in the Palm Springs area (id. ¶ 14).

PSMC brings the following federal claims: conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act, 15 U.S.C. § 15; attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act; conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act; and injunctive relief pursuant to Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26. PSMC also brings the following state claims: trust in restraint of trade in violation of the Cartwright Act, Cal.Bus. & Prof.Code §§ 16700 et seq.; defamation; intentional and negligent interference with

prospective business advantage; and unfair competition in violation of Cal.Bus. & Prof.Code §§ 17200 *et seq.* These pendent claims constitute PSMC's fifth, sixth, seventh, and eighth counts in the Complaint.

Desert and Tynberg have moved to dismiss the Complaint under Fed.R.Civ.P. 12(b)(1) and for a more definite statement under Fed.R.Civ.P. 12(e). Desert's basis for dismissal is that it is a "local government" within the meaning of the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (1984) (to be codified as 15 U.S.C. §§ 34–36) [hereinafter cited as 1984 Act] and therefore absolutely immune from damage liability under the Clayton Act. Desert and Tynberg further argue that they cannot be sued under the Cartwright Act because the Cartwright Act does not apply to the medical profession nor to state subdivisions. In conjunction with its Motion, Desert has introduced extrinsic evidence showing that it is a hospital district within the meaning of Cal. Health & Safety Code §§ 32000 *et seq.* (Motion exs. C & D).[1]

In addition, the Court has issued an Order To Show Cause to plaintiff why the pendent state claims should not be dismissed. Both plaintiffs and defendants submitted extensive briefing in response to the Court's order.

The Court waived oral argument regarding the Order To Show Cause pursuant to Local Rule 7.11 and Fed.R.Civ.P. 78 and heard oral argument on Desert and Tynberg's Motion, and now grants Desert's motion to dismiss based on the 1984 Act; denies Tynberg's motion for a more definite statement; and dismisses the pendent state claims. The Court thus does not reach the question of whether Desert or Tynberg may be sued under the Cartwright Act.

### 1. *Desert's motion to dismiss based on the 1984 Act.*

The 1984 Act provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity." 1984 Act § 3(a). Moreover, "[n]o damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity." *Id.* § 4(a). The term "local government" is defined as "a city, county, parish, town, township, village, or any other general function government unit established by State law" or "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States." *Id.* §§ 2(1)(A), (B).

■ Desert argues that, as a hospital district, it comes under the 1984 Act's definition of "local government" and is thus entitled to the protections of the 1984 Act. Desert makes this argument based on the legislative history of the Act and the manner of creation and regulation of hospital districts by Cal. Health & Safety Code §§ 32000 *et seq.*[2] PSMC has not seriously

---

**1.** Although Desert and Tynberg noticed their motion as one under Fed.R.Civ.P. 12(b)(1), the language of their motion implicates Fed.R.Civ.P. 12(b)(6). Use of extrinsic evidence is permissible in a motion under Fed.R.Civ.P. 12(b)(1) but not a motion under Fed.R.Civ.P. 12(b)(6), unless the court converts the motion into one for summary judgment with notice to the parties. Fed. R.Civ.P. 12(b)(6); *see also Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 429–30 (9th Cir.1978). Plaintiffs did not raise the issue in their briefs or in oral argument, and did not object to the Court's consideration of the extrinsic evidence offered by Desert and Tyn-

berg. In any case, the Court takes judicial notice of the County of Riverside Board of Supervisors resolution establishing the Desert Hospital District pursuant to Cal.Health & Safety Code §§ 32000–32313 (attached as Exhibit C to defendants' Motion) under Fed.R.Evid. 201(b), (c).

**2.** The language of the 1984 Act is inclusive and not exclusive, defining a "local government" as "a school district, sanitary district, or *any other special function governmental unit* established by State law in one or more States." 1984 Act § 2(1)(B) (emphasis added). The report of the

disputed this contention in its opposition papers and did not address the problem in oral argument, instead assuming *arguendo* in its briefing that hospital districts such as Desert came under the 1984 Act. In a footnote, PSMC does argue that (1) neither the Act nor the legislative history explicitly includes hospital districts in the list of "local governments"; (2) no case has applied the 1984 Act to a hospital district, and (3) Desert is attempting to become an independent hospital even at the time it seeks refuge under the 1984 Act as a "local government." However, (1) the portions of the Act and legislative history cited by Desert in its Motion are explicitly inclusive, not exclusive, in language, and thus may include hospital districts in the definition of "local governments"; (2) no case has reached the question of whether hospital districts come under the 1984 Act; and (3) Desert's future intentions are irrelevant to its present status for purposes of the 1984 Act. The Court thus accepts Desert's contention that it is a "special function governmental unit" for purposes of the 1984 Act.

PSMC also argues that the Act does not reach Sherman Act claims, since it is directed only to the Clayton Act. PSMC cites in support language from *Montauk-Caribbean Airways, Inc. v. Hope,* 5 Trade Reg. Rep. (CCH) ¶ 66,660 at 63,104 (E.D.N.Y. 1985) to the effect that "the broad prohibition of the Local Government Antitrust Act does not reach Sherman Act claims." However, the legislative history of the 1984 Act makes clear that it was the damage remedy against local governments that the Act was adopted to eliminate. *See, e.g.,* Senate Rep., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 380, 381; 130 Cong.Rec. H12188 (1984) (statement of Rep. Rodino); *id.* at S14364 (statement of Sen. Thurmond); *id.* at

House Committee on the Judiciary, H.R.Rep. No. 98–965, 98th Cong., 2d Sess, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4602 [hereinafter cited as House Rep.], in reporting to the House the predecessor bill to the 1984 Act, H.R. 6027 (defining "local government" as a "city, county, parish, town, township, village, school district, sanitary district, or any other general or special purpose political subdivision of one or more States") says further that

[e]xamples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Such a subdivision would have a geographic jurisdiction that is not contiguous with, and is generally substantially smaller than, that of the State that established it. The definition, however, would encompass special purpose governmental units that operate in more than one State. For example, regional planning boards, environmental organizations, or airport or port authorities may be established in two or more States.

"Special purpose" subdivisions of States should not be read to include largely private regulatory bodies that operate with the sanction of a local government.... [A] group such as a county or city bar association, dental association or medical association that regulates entry and enforces professional ethics is not a local governmental unit.

*Id.* at 19–20, 1984 U.S.Code Cong. & Ad.News, 4620, 4621. The report by the Senate Committee on the Judiciary, reporting the Senate version of H.R. 6027, S. 1578, is also noteworthy:

It is important to note that the damage protection afforded private parties ... is not applicable if their liability arises from activity involving the 'purchase or sale of goods or services' on a commercial basis by the unit of local government in competition with private persons. Thus, if a city operates its own ambulance service on a commercial basis in competition with three private ambulance companies, and all conspire to fix prices, the three private companies may be subject to treble damages. The city itself would, however, remain subject to injunctive remedy only.

S.Rep. No. 98–593, 98th Cong., 2d Sess., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 379, 381 (Aug. 23, 1984) [hereinafter cited as Senate Rep.].

Desert argues that its creation and regulation pursuant to California statute, Cal. Health & Safety Code §§ 23000–32492, and its performance of a public function by protecting public health and welfare through furnishing hospital services in areas with inadequate care, *see Talley v. Northern San Diego Hospital District,* 41 Cal.2d 33, 40, 257 P.2d 22, 29 (1953) renders it a "special function governmental unit" for purposes of the 1984 Act. Plaintiffs did not address this point in their papers or in oral argument. At least one case has applied the 1984 Act to a city hospital building authority, which, like a hospital district, is a special function governmental unit performing functions traditionally performed by private parties. *Huron Valley Hospital v. City of Pontiac,* 612 F.Supp. 654, 664–65 (E.D.Mich.1985).

S14367 (statement of Sen. Moynihan). Section 4 of the Clayton Act *is* the damages remedy for violations of the Sherman Act. Accordingly, when damages are sought through Section 4 of the Clayton Act, it makes no difference whether the underlying violation is of Sections 1 or 2 of the Sherman Act, or Clayton Act claims.

PSMC further argues that the 1984 Act confers only a restricted immunity upon local governments rather than the absolute immunity urged by Desert. In its opposition papers and oral argument, PSMC contended that the 1984 Act conferred immunity upon local governments only for official conduct, which PSMC defined as "any conduct within the government's lawful regulatory authority." [3] PSMC argues that Desert cannot have engaged in "official conduct" in this case given the egregious nature of the alleged violations.

■ On its face, the 1984 Act suggests that Desert's interpretation of blanket immunity for local governments is correct. The Court's inquiry into the proper interpretation of the Act must begin with the 1984 Act's express language. "Where ... resolution of a question of federal law

---

**3.** Nowhere in its Complaint does PSMC allege that Desert acted outside its official capacity. Cal. Health & Safety Code § 32128 provides that the rules of a district hospital established by a hospital district board of directors "shall include ... [p]rovision for the organization of physicians and surgeons ... licensed to practice in this state who are permitted to practice in the hospital into a formal medical staff" and "[p]rovision for procedure for appointment and reappointment of medical staff as provided by the standards of the Joint Committee on Accreditation of Hospitals." Likewise, Cal.Health & Safety Code § 32121 provides that the local hospital district may "purchase, receive, have, take, hold, lease, use and enjoy property of every kind and description within the limits of the district," "do any and all things which an individual might do which is necessary for and to the advantage of a hospital," and "establish, maintain, and operate one or more hospitals, situated within the territorial limits of the district."

PSMC would read into the "official capacity" language of the 1984 Act a requirement that the local government act in good faith in exercising its official authority. The House Committee report accompanying H.R. 6027 supports that interpretation:

> The definition of official conduct allows room for good faith errors by local government officials in conducting the public business. Conduct falls within the definition if the actor 'could reasonably have construed' his actions to be within the authority of the local government.... On the other hand, participation in criminal acts, or other behavior clearly falling outside a local government's authority, would fall outside the definition of official conduct.

House Rep. at 20, 1984 U.S.Code Cong. & Ad. News, 4621. H.R. 6027, however, differed in significant respects from the Senate version, S. 1578, which conferred blanket immunity from damages on local governments. Discussion in the House following the conference committee's report on the compromise bill between the House and Senate versions of H.R. 6027 reveals that the House came to contemplate protection for local governments in all aspects of decisionmaking and exercising of authority:

> Competition is important in free enterprise and the operation of our economic system. When you move over to governmental decisions, then the competitive factor is not relevant, really, or far less relevant than environmental considerations, health considerations, safety considerations, and a whole panoply of issues that a governmental body must take into consideration in its judgments allocating contracts, access to sewer lines, zoning, and things like that.
>
> So it is clear that the antitrust laws ought to be inapplicable to governmental decisions certainly in their most harsh aspect and that is treble damages for governmental decisions. The problem is governments make decisions, State governments and local governments, based on their best judgment on a range of considerations that are not contemplated by antitrust laws. So the antitrust law is a square peg trying to be forced into the round hole of government operation. This remedy is very much needed.

130 Cong.Rec. at H12183 (statement of Rep. Hyde). Other discussions in the House and Senate reveal concern for the paralyzing effect that antitrust damage liability would have on local government decisionmaking. *See* note 4 *infra.* Thus, even if the Court were to read an "official capacity" limitation into the 1984 Act's immunity for local governments, it would constrain that limitation to all decisions made by a local government in an "official capacity," and not just those made in good faith, in order to give effect to the Congressional purpose. While a hospital district may abuse or improperly exercise its powers under the state Health & Safety Code, *see, e.g. Rosner v. Eden Township Hospital District,* 58 Cal.2d 592, 598–99, 375 P.2d 431, 434–35, 25 Cal.Rptr. 551, 554–55 (1962), that does not mean automatically that a hospital district acts outside its "official capacity" as that term was ultimately understood by Congress.

turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). "The starting point of [the court's] analysis is the language of the statute itself." *American Textile Manufacturing Institute, Inc. v. Donovan*, 452 U.S. 490, 508, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981). The Act states flatly, with no limiting language, that no damages "may" be recovered under the Clayton Act "from any local government." 1984 Act § 3(a). That same sentence goes on to say that no damages may be recovered from any "official or employee thereof acting in an official capacity." *Id.* The placement of the comma in that sentence between the clauses "any local government" and "or official or employee thereof," and the lack of a comma between the clauses "official or employee thereof" and "acting in an official capacity," indicate that the limiting words "acting in an official capacity" apply only to the clause "official or employee thereof" and not the clause "any local government." The juxtaposition of these two clauses suggests that, had Congress intended that lo-

cal governments have immunity only for actions taken in an official capacity, it would have so indicated by express language, just as it did in the case of "official[s] or employee[s] thereof." It is also noteworthy that Congress repeats the distinction when it states that no damages "may be recovered ... in any claim against a person, or official or employee thereof acting in an official capacity." *Id.* § 4(a).

The legislative history supports the conclusion that local governments have absolute immunity under the Act. The 1984 Act was passed in response to *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), in which the Supreme Court held that a state's grant of home-rule powers to a municipality was insufficient authorization by the state to cloak the municipality in state action immunity under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See* Senate Rep., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 379; House Rep. at 2–3, 1984 U.S.Code Cong. & Ad.News, 4602, 4603.[4] Representative Rodino, Chairman of the House Committee on the Judiciary, intro-

---

**4.** PSMC contended in oral argument that because the 1984 Act was passed in response to *Boulder,* its sole purpose was to overrule *Boulder.* Under this theory, the 1984 Act would immunize local governments only when their actions are within their lawful authority granted by the state and pursuant to a "clearly articulated and affirmatively expressed" state policy. *Boulder,* 455 U.S. at 51, 102 S.Ct. at 840. To say that the 1984 Act was sparked by *Boulder,* however, is not to say that its sole purpose was to overrule *Boulder.* Both the House and Senate Committees on the Judiciary, in reporting H.R. 6027 and S. 1578 to their respective chambers, reflected a concern over the increasing number of lawsuits and large damage awards against local governments spawned by *Boulder* and *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) "that could undermine a local government's ability to govern in the public interest." House Rep. at 2; *see also id.* at 10 (citing *Unity Ventures v. County of Lake,* No. 81 C–2745 (N.D.Ill.1984), in which $28.5 million in damages, after trebling, was awarded by a jury against a county and village). The Senate Committee stated:

> It would appear that in many instances, the practical impact of *Boulder* ... has been to

paralyze the decisionmaking functions of local government. The threat of antitrust treble damage actions has caused local officials to avoid decisions that may touch on the antitrust laws even when such decisions have involved critical public services. Furthermore, it would also appear that uncertainty of whether particular actions may be anticompetitive might have lead to the making of no decision at all, resulting in, for example, the inclusion of all bidders in a franchise, rather than choosing the most economical and efficient bidder. In either case, where a local government has avoided the issue or where it has simply allowed all comers to participate, the public interest may not have been well-served. In addition the Committee is concerned by delays in the decisionmaking process during the pendency of time-consuming and costly antitrust damage litigation.

Senate Rep., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 379. S. 1578 as originally introduced would have bestowed a local government antitrust immunity comparable to that of state governments under *Parker;* but S. 1578 as reported, rather than "address[ing] the basic application of the antitrust laws to local governments," left *Boulder* unchanged and "alter[ed] the antitrust remedies

duced H.R. 5993 on June 28, 1984 in response to *Boulder*, joined by Representatives Fish, Edwards, and Hyde. An amended version was submitted to the Clerk of the House of Representatives as H.R. 6027, and was reported to the House by the committee on August 1, 1984. House Rep. at 3. PSMC points to several passages in the Report by the House Committee in support of its proposition that Congress intended for the 1984 Act to extend only to official action by local governments. In that report, the Committee did not appear to contemplate absolute immunity for local governments. The bill, as construed by the Committee, "eliminates

available against local governments, or against private parties acting at the direction of local governments," by "flatly prohibit[ing] any award of damages." *Id.* at 380. It was "inappropriate to assess damages which ultimately must be borne by taxpayers," regardless of whether the local government had violated the antitrust laws, and the Senate Committee was further "aware of the tremendous financial burden which can be placed on local governments in merely defending antitrust suits regardless of the outcome." *Id.* This purpose was much broader than that of H.R. 6027, which, as reported by the House Committee, did extend "[p]rotection against [treble] damage suits . . . to local governments if they act within their authority, dispensing with the test in [*Boulder*] that a local government act in every instance pursuant to a 'clearly articulated and affirmatively expressed' state policy." House Rep. at 2. The language of the 1984 Act reflects that of S. 1578, with its blanket immunity for local governments, and not that of H.R. 6207, and the House passed the final version after it came back from conference while distinguishing between blanket immunity for local governments and "official capacity" immunity for officials. *See, e.g.,* 130 Cong.Rec. at H12188 (statement of Rep. Rodino). Representative Hyde, in urging passage of the final version of H.R. 6027, further spoke of the "ticking bomb" left by *Boulder* which was to be remedied by the legislation. Similarly, during the Senate passage of H.R. 6027 as reported by the conference committee, Senator Thurmond stated:

This legislation brings much-needed order and certainty to our Federal antitrust laws as they apply to local governments. Needless to say, local governments throughout the country have lived in the shadow of [*Boulder*], and it is time that the Congress answers at least one major question that Boulder raised: Whether both local governments and nongovernmental parties acting at the direction of

antitrust damage liability for official conduct of a local government and its officials, and for certain parties who deal with a local government in suits brought under . . . the Clayton Act." *Id.* at 2, 1984 U.S. Code Cong. & Ad.News at 4603.[5] The Committee report, however, pertained only to H.R. 6027 as reported by it to the House. That bill differed in crucial respects from the final version of the 1984 Act and was to be narrowed significantly by Senate amendments. Section 2, Paragraph 2 of H.R. 6027

define[d] the term 'official conduct of a local government.' That term cover[ed]

local governments, should be liable for treble damages.

*Id.* at S14364 (statement of Sen. Thurmond). Senator Moynihan, after noting the large number of antitrust damage suits filed against local governments after *Boulder* and their paralyzing effect on decisionmaking, urged passage of the legislation as "balanc[ing] the need of local governments to provide essential services—without the fear of lawsuits—and the right of aggrieved parties to seek injunctive relief against cities." *Id.* at S14367 (statement of Sen. Moynihan).

The purpose of the bill as applied to local governments, then, was to eliminate the financial burden and decisionmaking paralysis caused by the threat of treble damage antitrust suits, and not merely to overrule *Boulder*.

5. PSMC also points to several comments by representatives during the consideration of the original H.R. 6027 and of the final conference bill in support of its "official capacity" theory regarding local government immunity. At most, these were off-hand comments that scarcely reflected substantive consideration of what the bill was intended to do. *See, e.g.,* 130 Cong.Rec. at H12175 (H.Res. 616) (by which House waived its rules to allow expedited consideration of the conference report on H.R. 6027, referring to it as "the bill . . . to clarify the application of the Clayton Act to the official conduct of local governments"); H.Conf.Rep. No. 98–1158, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 4626 (conference committee, in reporting H.R. 6027 to House and Senate, referred to the "bill . . . clarify[ing] the application of the Federal antitrust laws to the official conduct of local governments"); 130 Cong.Rec. at H12176 (statement of Rep. Rodino) (in which Representative Rodino, calling up the conference report pursuant to H.Res. 616, referred to the bill "to clarify the application of the Clayton Act to official conduct of local governments").

both action or inaction by a local government, or 'its officials, employees, or agents,' that such actors 'reasonably could have construed to be within the legislative, regulatory, executive, administrative, or judicial authority' of the local government.

*Id.* at 20. Likewise. Section 3(a) of H.R. 6027 "preclude[d] actions for damages under ... the Clayton Act against a local government, or its officials, employees, or agents, resulting from official conduct of a local government." *Id.* at 21. The House passed H.R. 6027 on August 8, 1984. 130 Cong.Rec. at H8622-23.

When H.R. 6027 was referred to the Senate for consideration, the Senate immediately amended the bill to read as follows before passage on October 4, 1984:

> Sec. 2. (a) Sections 4, 4A, and 4C of the Clayton Act ... shall not apply to any law or other action of or official action directed by, a city, village, town, township, county, or other general function unit of local government in the exercise of its regulatory powers, including but not limited to zoning, franchising, licensing, and the establishment or provision of public services on an exclusive or nonexclusive basis in a manner designed to insure public access or otherwise to protect the public health, safety, or welfare, but excluding the purchase or sale of goods or services on a commercial basis by the unit of local government in competition with private persons, where such law or action is valid under State law
>
> ....
>
> (b)(1) No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C, of the Clayton Act ... from any unit of local government or official thereof acting in his official capacity.

*Id.* at S13574-75. Thus Section 2(a) of the amended version distinguished between a "law or other action" of a local government and "official action directed by" that local government "in the exercise of its regulatory powers." Section 2(b)(1), again, distin-guished between the prohibition against damages from a "unit of local government," to which no limiting language applied, and damages from an "official thereof acting in his official capacity." This language, vastly narrowed from that of H.R. 6027 as passed by the House, comported with the Senate version of H.R. 6027, S. 1528, as reported to the Senate by the Senate Committee on the Judiciary. *See* Senate Rep., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 380. S. 1578, as reported by the Committee, itself was different in crucial respects from S. 1578 as introduced. *Id.* In particular, S. 1578 as reported by the Committee included the limiting language of Section 2(b)(1): "No damages ... may be recovered under ... the Clayton Act ... from any unit of local government or official thereof acting in his official capacity." *Id.* S. 1578 as reported "flatly prohibits any award of damages against both general and special function units of local government under Sections 4, 4A and 4C of the Clayton Act." *Id.* The Senate report added that subsection 2(b)(1)

> is an absolute prohibition in the recovery of any antitrust damages against general or special function units of local government or against any local government official 'acting in his official capacity.' The intent of the latter provision is to insure that local government officials performing their normal, lawful functions will not be personally responsible for damages when the local government itself is not. Subsection 2(b) is clear that in absolutely no circumstances can local governments or their officials acting in their official capacity be held liable for damages under the Clayton Act.

*Id.* at 381. "Pursuant to Section 2(b) of S. 1578 as reported, the sole private remedy against any local government violating the federal antitrust laws would be injunctive relief pursuant to Section 15 of the Clayton Act." *Id.* at 379. The Senate report based its flat prohibition of antitrust damages against local governments on the belief that taxpayers should not be forced to bear the treble damage remedies recoverable

from local governments under extant law, and on the belief that local governments should not be forced to spend public funds in defending baseless antitrust suits. *Id.; see also Chris' Wrecker Service, Inc. v. Town of Fairfield,* 619 F.Supp. 480, 481 (D.Conn.1985); *Jefferson Disposal Co. v. Parish of Jefferson,* 603 F.Supp. 1125, 1129 (E.D.La.1985). The Senate version of H.R. 6027 thus represented a great departure from the House's contemplation of an "official action" limitation on both local government and official immunity. It is clear from the Senate report that the "official capacity" limitation would apply only to officials, not to local governments themselves. The prohibition regarding Clayton Act damages against local governments was absolute.

H.R. 6027 as passed by the House and Senate was sent to a conference committee in order to resolve the differences between the two versions. The version that emerged from conference adopted the Senate, not the House, treatment of local government versus official immunity. Section 3(a) of the final version precluded damages against "any local government, or official or employee thereof acting in any official capacity." 130 Cong.Rec. at H12182. "Actions of officials that fall outside a local government's authority, such as participation in criminal acts, would fall outside the protections of this section." *Id.* (statement of Rep. Rodino). Section 3(a)

> requires that *an official or an employee of the local government* must be acting in his official capacity....
>
> Looking ahead, we have the satisfaction of knowing that in the future this legislation will be providing protection for local governments, or their officials or employees acting in an official capacity, against antitrust damage actions brought under the Sherman Act and the Clayton Act.

*Id.* at H12188 (statement of Rep. Rodino; emphasis added). Thus Representative Rodino, who introduced the original version of H.R. 6027, chaired the House Committee on the Judiciary, and participated on the conference committee that worked out the fi-

nal compromise between the House and Senate versions, now spoke of different standards of immunity for local governments and their officials, in contrast to statements by him and other representatives when H.R. 6027 was originally considered by the House. Other statements reflected deep concern in the House about treble damage suits against local governments and the resulting burden on taxpayers and paralysis of government decisionmaking. *See, e.g., id.* at H12180–81, H12183 (statement of Rep. Seiberling); *id.* at H12177–78 (statement of Rep. Rodino); *id.* at H12180 (statement of Rep. Edwards); *id.* at H12183 (statement of Rep. Hyde). The House voted to accept the committee report, *id.* at H12188–89, on October 11, 1984.

The Senate voted to accept the conference report on the same date, in language that left no doubt that the Senate contemplated absolute immunity for local governments. Senator Thurmond stated:

> [T]his legislation makes the determination that under no circumstances can local governments be sued for damages; as long as nongovernmental parties engage in 'official action directed by a local government, or official or employee thereof acting in an official capacity,' damages cannot be assessed against them as well. Injunctive relief under section 16 of the Clayton Act, however, can still be obtained against both local governments and nongovernmental parties.

*Id.* at S14364 (statement of Sen. Thurmond); *see also id.* at S14367 (statement of Sen. Moynihan); *id.* at S14367–68 (statement of Sen. Metzenbaum). The bill was enacted on October 24.

The legislative history thus demonstrates that, while the House may have originally contemplated an "official action" limit on both local government and official immunity, both the House and Senate passed the final version of the 1984 Act with the intent that local government immunity be blanket and absolute. PSMC, as a final argument,

contends that such blanket immunity is against public policy in that it would absolutely shield local governments from liability for antitrust violations. The legislative history of the 1984 Act, however, indicates that Congress thought that public policy would best be served by limiting the antitrust remedy against local governments to injunctive relief. According to the Senate Committee, "the sole private remedy against any local government violating the Federal antitrust laws would be injunctive relief pursuant to Section 16 of the Clayton Act." Senate Rep., *reprinted in* [July-Dec.] Antitrust & Trade Reg.Rep. (BNA) No. 1179 at 380. Furthermore, when the House considered the final version of the 1984 Act as reported by the conference committee on October 11, 1984, Representative Mazzoli asked:

> Are we not by this action insulating State and local municipal government in their antitrust activities? They can now combine in restraint of trade, they can violate antitrust laws, and the individual citizens of the community cannot reach them.

130 *Cong.Rec.* H12183 (statement of Rep. Mazzoli). Representative Rodino replied:

> The gentleman is incorrect in the conclusion that he reaches, since local governments are still subject to injunctive suits and Federal enforcement. So I believe that this matter is remedied by the fact that the injunctive relief still prevails.

*Id.* (statement of Rep. Rodino). Representative Seiberling then stated for purposes of further explanation:

> First of all, the policy of the antitrust laws is to encourage competition in the private sector. Local governments are not in the private sector. Public policy, with respect to local government, is a different policy. Second, local governments are supported by the taxpayers. If we allow treble damages against local governments the taxpayers are going to end up paying the bill for official actions by local governments.

> If a local government goes beyond its powers and tries to interfere with trade by activities in the private sector, then there are injunctive remedies that are not touched by this bill. Furthermore, for local officials who abuse their official power, there is the electoral process by which the public can dispose of them.

> So those are the protections we have that will still be there to prevent local governments from overstepping.

*Id.* (statement of Rep. Seiberling). Likewise, when the Senate voted to accept the conference report, Senator Thurmond stated that the legislation "strikes an appropriate balance. While taxpayers will not have to pay treble damage awards, injunctive relief will still be available to halt and prevent antitrust violations." *Id.* at S14364 (statement of Sen. Thurmond). Likewise, Senator Moynihan stated that H.R. 6027

> would simply provide immunity to local governments from damage awards sought under the provisions of the Clayton Act, permitting them to provide essential services unfettered by the fear that they will be sued for damages. At the same time, however, the conference report on H.R. 6017 [sic] preserves the rights of aggrieved parties to seek injunctive relief against local governments.

*Id.* at S14367 (statement of Sen. Moynihan). Finally, Senator Metzenbaum stated:

> I am frank to admit that I had some reservations as to whether or not [cities] should be provided this kind of exemption from the antitrust laws with respect to monetary damages. If they violate the law, if they combine in restraint of trade, if they preclude competition, it seems to me you can make a strong argument that an injured party ought to be able to have its day in court. On the other hand, the cities have made the argument that the cost of defending those cases are [sic] significant, that they could not afford the judgments which were being sought against them, and that in many instances their actions were not intended to preclude competition. So, as

a consequence, we worked out an arrangement. The arrangement provides for injunctive relief against the cities and not for monetary damages.

. . . .

This bill gives substantial protection to our Nation's cities and counties. They will not be subject to ruinous monetary damages arising out of actions held to be antitrust violations.

At the same time, the act ensures that the national policy of free competition will be preserved, for cities and counties will be subject to injunctive relief by private parties injured by anticompetitive actions, and by both Federal antitrust enforcement agencies, the Department of Justice, and the Federal Trade Commission.

*Id.* at S14367–68 (statement of Sen. Metzenbaum). In short, the House and Senate had fully considered PSMC's "public policy" argument and nonetheless decided that the proper balance lay in favor of only injunctive relief, not damages, against local governments.[6]

Thus Desert is immune from suit for damages under the Clayton Act, and counts 1, 2, and 3 of the Complaint (those counts for Clayton Act damages) are dismissed as against Desert.

2. *Tynberg's motion for a more definite statement.*

■ Tynberg's alleged actions could come under two areas of the 1984 Act, thus shielding Tynberg from antitrust damages. First, Tynberg could be considered an "official or employee . . . acting in an official capacity." 1984 Act § 3(a). Second, he could be considered "a person" whose actions were "based on any official action directed by a local government, or official or employee acting in an official capacity." *Id.* § 4(a). PSMC's Complaint, in listing

the alleged anti-competitive actions by Desert, Tynberg, and Supple, uses a broad brush, referring to the three collectively as "defendants" and failing to state which acts were committed by whom or in what capacity. Although the allegations are conclusory and may not provide Tynberg with as much detail about his alleged role as he would like, they are not so "vague or ambiguous that [Tynberg] cannot reasonably be required to frame a responsive pleading" under Fed.R.Civ.P. 12(e). Tynberg can simply respond that he did not commit the alleged acts, or, if he did commit them, that such acts were done in his official capacity or were based on official action directed by Desert.

Counsel for Tynberg contended during oral argument that, given Congress' intent in the 1984 Act to shield local governments from the expense of defending baseless antitrust suits, PSMC should be required to provide a more definite statement so that Tynberg may determine immediately whether he is immune from damages. The Court declines, however, to read an exception into the liberal pleading requirements of Fed.R.Civ.P. 8(a) and 12(e) based on Congressional intent behind the 1984 Act. The detail that Tynberg seeks is more effectively and expeditiously sought through interrogatories or other discovery devices and not through the initial pleading stage. *See In re Arthur Treacher's Franchisee Litigation,* 92 F.R.D. 398, 406 (E.D.Pa.1981). The Complaint in this case ensures an adequate framework for discovery even given the complexities of antitrust litigation. *See Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983). "Rule 12(e) is designed to strike an unintelligibility rather than want of detail. . . . A motion for a more definite statement should not be used

---

**6.** PSMC in its opposition papers also quotes several statements by representatives during the October 11, 1984 session, in which they address the problem of the 1984 Act's applicability to pending cases, as support for its proposition that the 1984 Act was intended only to apply to local government action within its lawful au-

thority. *See* 130 Cong.Rec. at H12183–86. Those statements pertained, as PSMC acknowledges, to the equities of applying the 1984 Act to pending cases. The instant action, filed on September 18, 1985, was not pending when the 1984 Act was passed, and these statements are inapposite.

to test an opponent's case by requiring him to allege certain facts or retreat from his allegations." *Juneau Square Corp. v. First Wisconsin National Bank,* 60 F.R.D. 46, 48 (E.D.Wis.1973).

### 3. *Pendent claims.*

The Court is obliged to dismiss pendent claims that do not derive from a common nucleus of operative facts. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Dismissal of pendent state claims is also appropriate where the state law issues predominate in terms of proof, scope of the issues raised, or comprehensiveness of the remedies sought; where there is likelihood of jury confusion in treating divergent theories of relief; or where retaining the pendent claims will impede the interests of judicial economy, convenience, and fairness to the parties. *Id.* at 726–27, 86 S.Ct. at 1139; *see also Kehr v. Smith Barney, Harris Upham & Co.,* 736 F.2d 1283, 1287 (9th Cir.1984); *Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1318 (9th Cir.1982).

Although it appears at this time that the claims may derive from a common nucleus of operative fact, other factors weigh against the Court's exercise of its discretionary power to entertain the pendent claims for violation of the Cartwright Act; defamation; intentional and negligent interference with prospective business advantage; and unfair competition. Given the inherent complexity and unsettled law of civil antitrust claims, the Court believes that to entertain these pendent state claims as well would needlessly complicate trial of the federal claims and unnecessarily waste the Court's time. *Cf. Belshaw v. Credit Bureau of Prescott,* 392 F.Supp. 1356, 1361–62 (D.Ariz.1975) (refusal by court to exercise pendent jurisdiction in claim under Fair Credit Reporting Act). "Other things being equal, it is preferable for state law claims to be adjudicated by state courts." *Determined Productions, Inc. v. R. Dakin & Co.,* 514 F.Supp. 645, 649 (N.D.Cal.1979). "In weighing considerations of economy,

... the Court must be mindful of the increasingly heavy demands upon its limited resources." *Id.*

Additionally, three pendent state claims—for defamation, unfair competition, and negligent and intentional interference with a prospective business advantage—all involve substantially different issues and proof than that required to establish violation of Sections 1 and 2 of the Sherman Act. As a result, there is a strong possibility that the state law issues involved in these pendent claims will predominate in the lawsuit and result in needless decisions of state law, further weighing in favor of dismissal of these claims. *See Gibbs,* 383 U.S. at 726–27, 86 S.Ct. at 1139; *Belshaw,* 392 F.Supp. at 1362. For the same reasons, the Court concludes that there is a very strong likelihood that jury confusion will result from what would be a long and complex trial and set of jury instructions. *See Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139. The combination of the antitrust charges and the instructions on liability on defamation, intentional and negligent interference with prospective business advantage, and unfair competition "would so complicate the jury charge as to make it incomprehensible. That alone is a sufficient reason to deny the exercise of pendent jurisdiction." *Kerby v. Commodity Resources Inc.,* 395 F.Supp. 786, 790 (D.Colo.1975) (refusal to exercise pendent jurisdiction in claim for violation of Securities Exchange Act of 1934 and Rule 10b–5). The Court also determines that the interests of judicial economy would not be served by retaining the pendent claims. *Determined Productions,* 514 F.Supp. at 649; *Kerby,* 395 F.Supp. at 789–90. Indeed, the Court believes that this litigation would be conducted in a more efficient and economical manner if the pendent claims are dismissed. This is particularly true given the fact that PSMC has already filed actions in state court, of which the Court takes judicial notice under Fed.R.Evid. 201(b), (d), against individuals, including Supple, arising out of facts related to or the same as those serving as the basis of the instant action. *Cf. Pinkney v. Ohio Environmental Protec-*

*tion Agency,* 375 F.Supp. 305, 312 (N.D. Ohio 1974) (where "plaintiffs ha[d] scrupulously separated federal and state claims and [we]re litigating state claims in a separate suit in state court," district court declined to take jurisdiction over pendent claims).

■ Dismissal of plaintiff's claims under the Cartwright Act, Cal.Bus. & Prof.Code §§ 16700 *et seq,* is particularly appropriate in this case. Desert and Tynberg in their motion move to dismiss this claim on two grounds: (1) the Cartwright Act does not apply to the practice of medicine; and (2) the Cartwright Act does not allow suits against state subdivisions. While the Cartwright and Sherman Acts are similar, and Sherman Act cases are authoritative in construing the Cartwright Act, *see Derish v. San Mateo-Burlingame Board of Realtors,* 724 F.2d 1347, 1350 (9th Cir.1983); *Dimidowich v. Bell & Howell,* 590 F.Supp. 45, 48–49 (E.D.Cal.1984); *Rosack v. Volvo of America Corp.,* 131 Cal.App.3d 741, 751, 182 Cal.Rptr. 800, 806 (1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983), the instant case involves what appears to be a question of first impression in California law. In *Willis v. Santa Ana Hospital Association,* 58 Cal.2d 806, 376 P.2d 568, 26 Cal.Rptr. 640 (1962), the state Supreme Court held that, based on the language of Cal.Bus. & Prof.Code § 16720, the Cartwright Act did not apply to the professions, including medicine. *See also Osteopathic Physicians & Surgeons v. California Medical Association,* 224 Cal. App.2d 378, 396, 36 Cal.Rptr. 641, 652 (1964). The United States Supreme Court's decision in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785–88, 95 S.Ct. 2004, 2012– 14, 44 L.Ed.2d 572 (1975), however, casts doubt on the continuing vitality of that exception, although no California court has yet reached the question. Such a matter is most appropriately decided by a state court, and this militates against retention of the pendent state claim. *See Manasen v. California Dental Service,* 424 F.Supp. 657, 669 n. 14 (N.D.Cal.1976), *rev'd on other grounds,* 638 F.2d 1152 (9th Cir.1979). "Needless decisions of state law should be

avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. That admonition is particularly appropriate where, as here, the Court would be required to address a question of first impression that potentially could result in overruling of the most recent authoritative statement of the state's highest court. In such circumstances, retention of the Cartwright claim may actually be an abuse of discretion. *See Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 772 (D.C.Cir.1982).

For the same reasons, Desert's argument that *People ex rel Freitas v. City of San Francisco,* 92 Cal.App.3d 913, 155 Cal. Rptr. 319 (1979) and *Widdows v. Koch,* 263 Cal.App.2d 228, 69 Cal.Rptr. 464 (1968) preclude a Cartwright action against it is best not decided by this Court. Both cases dealt with Cartwright claims against cities or counties—political subdivisions of California—and involved close analysis of legislative intent. No California case has expanded those holdings to cover a hospital district as a subdivision of the state. Whether a hospital district is or is not covered is better addressed by state courts with their expertise with respect to California law and the intent of the state legislature. *See Catalano v. Department of Hospitals,* 299 F.Supp. 166, 175 (S.D.N.Y. 1969).

Consequently, the Court is persuaded not to exercise its discretion to admit the pendent claims.

Accordingly, the Court orders as follows:

1. Desert's motion to dismiss based on the 1984 Local Government Antitrust Act is granted.

2. Tynberg's motion for a more definite statement is denied.

3. The pendent claims for violation of the Cartwright Act, defamation, intentional and negligent interference with prospective business advantage, and unfair competition (the fifth, sixth, seventh, and eighth counts) are dismissed without prejudice to

the merits. Plaintiffs are advised of their right to file the pendent claims in state court and the execution of this Order is stayed fourteen (14) days to facilitate such filing.

4. The clerk shall serve a copy of this Order by United States mail upon all counsel of record.